IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN EMGE,

    Plaintiff,

    v.

    Civil Action No.: BAH-23-2528

YESCARE CORP.,
ECI MEDICAL DIRECTOR,

    Defendants.

## MEMORANDUM OPINION

John Emge, a self-represented plaintiff incarcerated at Eastern Correctional Institution ("ECI"), filed this civil rights complaint pursuant to 42 U.S.C. § 1983. In response, Defendants YesCare Corp. ("YesCare") and ECI Medical Director filed a Motion to Dismiss or, Alternatively, for Summary Judgment.[1] ECF 20. Emge filed correspondence, which the Court will construe as a response in opposition to the motion. ECF 22. No hearing is required to address the pending motion. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, and by separate Order which follows, Defendants' motion, construed as one for summary judgment, shall be granted.

I.    **Background**

    A.    **Amended Complaint Allegations**

Emge states that he is in chronic care, which means he is supposed to be seen by a provider regularly to treat his "many physical disabilities." ECF 6, at 4. However, Emge asserts that between January 2022 and July 2023, he has not been seen and therefore his is experiencing

---

[1] The Clerk will be directed to amend the docket to reflect the full and correct spelling of Defendants' names as listed in the caption, which were taken from Defendants' motion. *See* ECF 20. The Court will refer to these spellings of Defendants' names throughout this opinion.

constant pain and his health continues to decline. *Id.* He further states that YesCare ignores his requests for help through the sick call process. *Id.* at 4-5. He alleges that even orders from the prison administration directing them to provide care have been unsuccessful. *Id.* Emge's injuries include nerve damage; decline in the mobility of his right shoulder; and back, neck, and knee damage as well as post-traumatic stress disorder. *Id.* at 5. He seeks monetary damages. *Id.*

Emge attaches a Request for Administrative Remedy ("ARP") which contains additional details and the Court construes as incorporated allegations to the Amended Complaint. *See* ECF No. 6-1. Emge complains that even when he is seen by "the medical administrator" he only gets "a promise, a smile, smoke and mirror's [sic]" but nothing actually happens to address his pain. *Id.* at 2. He states that he was supposed to see a doctor in June 2023 to have his medication adjusted and to discuss treatments plans but was ignored. *Id.* On August 22, 2023, the Warden found the ARP meritorious because Emge had not been seen for a chronic care visit since April 4, 2023. *Id.* at 1. Emge was added to the chronic care list and advised to continue to use the sick call process to access medical care. *Id.*

### B. Defendants' Motion

Along with their Motion to Dismiss or, in the Alternative, for Summary Judgment, Defendants submit the declaration of Dr. Donald Alves, current ECI Medical Director, (ECF 20-2) and Emge's medical records (ECF 20-3 through 20-15). Based on these records, Defendants assert that they are entitled to summary judgment because they have not been deliberately indifferent to Emge's medical needs.

Emge was transferred to ECI from Patuxent Institution on March 11, 2022. ECF 20-10, at 3. He submitted a sick call request on May 22, 2022, complaining that his chronic pain was "not being dealt with appropriately" and that his nerve damage in his knees, hand, and shoulder

2

was limiting his mobility. ECF 20-12, at 18. Emge complained that the pain was unbearable and he needed his medications renewed and refilled. *Id.* Lyrica was prescribed and approved three days later to treat his neuropathic pain. ECF 20-9, at 20.

RN Angela Vaughan saw Emge for his sick call request on May 30, 2022. ECF 20-9, at 17-19. Emge reported that his current medications were not effective and requested dosage increases and to add tramadol to his regimen. *Id.* at 17. Vaughan told Emge she would ask a provider; his current prescriptions included Baclofen, a muscle relaxer; Voltaren gel for arthritic pain; Excedrin Extra Strength ("EES"); ibuprofen; and Lyrica. *Id.* at 18.

Emge filed another sick call on June 28, 2022, stating that his medications were running out and he needed to see a doctor. ECF 20-12, at 17. He was notified that same day that his medications expired July 1 and an email was sent for them to be renewed. *Id.* Emge filed a similar sick call request on July 1, 2022. *Id.* at 16. CRNP Stephanie Cyran reordered the rest of Emge's medications (Baclofen, ibuprofen, Voltaren, and EES) and planned for a chronic care visit. ECF 20-9, at 2-3; ECF 20-8, at 36-37.

On August 22, 2022, Emge filed a sick call complaining about increasing pain in his feet, hand, and knees and that he had not been seen by a provider. ECF 20-12, at 15. In response, Emge was told that he had been referred to chronic care already. *Id.* Emge filed another sick call on September 17, 2022, reiterating his pain issues and reporting an increase in migraines. *Id.* at 13. His prescriptions for Lyrica and Voltaren gel were renewed on September 22, 2022. ECF 20-8, at 25. Emge filed another sick call on October 6, 2022, restating his complaints, labeling it an emergency, and noting that he had not been seen in chronic care since May. ECF 20-12, at 12.

Emge was seen for a chronic care visit on October 10, 2022, by Dr. Clayton Raab. ECF 20-8, at 16-20. Emge requested an increase in dosage for his Lyrica and Baclofen prescriptions to

3

treat his ongoing pain; Dr. Raab agreed. *Id.* at 16. Dr. Raab also submitted a consultation request for Emge to see an optometrist. *Id.* at 13-14.

Thereafter, Emge submitted sick calls on December 11, 2022, and January 8 and 11, 2023, complaining of his chronic issues as well as cold symptoms and stating that his medications were not being refilled as prescribed. ECF 20-12, at 6, 7, 10. RN Peggy Konopik saw Emge on January 12, 2023. ECF 20-7, at 32-33. She gave him guaifenesin and throat drops for his cold symptoms and made an appointment for Emge to see a provider regarding his other medications. *Id.* Emge's record showed that all his medications were current. *Id.* Still, Emge filed another sick call request on February 6, 2023, stating he had been sick for a week and did not have any EES for his headaches. ECF 20-12, at 5. Dr. Raab submitted a request for Lyrica that same day. ECF 20-7, at 28. Emge filed another sick call on February 15, 2023, asserting again that he needed to be seen as soon as possible because he was not receiving his medications. ECF 20-12, at 3. He noted that he had made numerous requests to the medical staff to resolve the issue. *Id.* RN Jennifer Adrion saw Emge that same day and noted that Emge's medication had been renewed and that Emge reported that he was "not getting the right medication." ECF 20-7, at 27. Emge was scheduled for a chronic care visit. *Id.* However, on March 2, 2023, Emge filed another sick call asserting his need for a chronic care appointment and medication refills. ECF 20-12, at 2. It was returned on March 4, 2023, with a note that his medications had been renewed and refilled. *Id.*

Emge saw CRNP Cyran on April 4, 2023, for a chronic care visit during which she did an extensive review of Emge's injuries and care since 2018. ECF 20-7, at 8-14. Emge's chronic pain stems from a slip and fall injury which resulted in a fracture. *Id.* at 8. Cryan also noted that there were several documented instances of Emge's diversion and abuse of his pain medications, specifically tramadol and Neurontin. *Id.* at 8-9. Notes from the April 4, 2023 appointment reflect

4

that Emge was prescribed Lyrica and Baclofen for pain, and "had a recent dosage increase" for his Lyrica prescription to 150 mg. *Id.* at 9. Emge requested another increase but Cryan told him it was "not indicated" at that time but that prescription would be reviewed at Emge's next chronic care appointment. *Id.* Emge also complained about his persistent headaches and told the provider that his medications were ineffective. *Id.* Cyran noted that Emge was scheduled for an optometry visit for prescription lenses and that they would follow up about his headaches afterward. *Id.* Otherwise, Cyran continued Emge's current treatment plan. *See id.* at 10-11. Emge received his glasses on April 20, 2023. ECF 20-11, at 25.

Emge filed a new sick call request on June 1, 2023, requesting to see CRNP Cyran about his medications and medical conditions. ECF 20-11, at 39. A response was sent June 3, 2023, informing him that he was scheduled for chronic care on June 24, 2023. *Id.*

On July 10, 2023, Emge filed a sick call request complaining of numbness in his shoulder and chest and requesting medication refills. ECF 20-11, at 38. RN Adrion saw him on July 22, 2023, at which Emge reported pain and numbness in his left shoulder. ECF 20-6, at 17-18. He also complained of a knot in his right shoulder. *Id.* at 18. Adrion observed that Emge had full range of motion but there was a dime-sized lump near his right scapula. *Id.* Emge's prescriptions were renewed and he was scheduled for chronic care. *Id.* CRNP Cyran also saw Emge on August 10, 2023, she renewed his medication and noted that he would be scheduled for chronic care. *Id.* at 13-15.

Emge filed another sick call on September 1, 2023, asserting he was in "grave condition" and had not seen a doctor in seven months. ECF 20-11, at 36. He noted that his administrative remedy procedure request ("ARP") was found meritorious by the Warden and he was supposed to be seen as soon as possible but 42 days had passed. *Id.* Emge saw RNP Oriaku Ijoma in chronic

5

care on September 7, 2023, to evaluate Emge's should pain, wrist injury, constipation, and migraines. ECF 20-6, at 4-7. Emge was continued on his medications and directed to continue doing his hand exercises; his pain was improving and his other conditions were stable. *Id.*

On October 6, 2023, Emge saw RN Sara Johnson for an open wound on his foot. ECF 20-4, at 3-4. Johnson noted that he had a "dry non-intact region between fourth and fifth toe on top of foot." *Id.* at 4. Emge saw Dr. Paul Matera on October 11, 2023, regarding the issue. ECF 20-3, at 39. Dr. Matera evaluated his foot, finding a cutaneous abscess, and examined a lump on Emge's scapula, which appeared to be a sebaceous cyst. *Id.* He prescribed an antifungal and antibiotic. ECF 20-4, at 1-2.

Emge saw CRNP Cyran in chronic care on November 22, 2023. ECF 20-3, at 26-32. He complained of his chronic pain and stated that he felt he was building tolerance to his Lyrica. *Id.* at 27. Because he had been on the dosage for one year, Cyran increased the dosage to 200 mg. *Id.* Cyran educated Emge "at length" to take his medications as prescribed and warned him that "if there is another instance of hoarding, diverting, altered mental status from ingestion, then medication regimen and care plan will be reviewed at length." *Id.* Cyran ordered an EKG, labs, and optometry consult; she also confirmed with a physician that Emge would have the small mass incised and drained the following week. *Id.* His medications were renewed. *Id.* at 28. Emge saw Dr. Matera on November 29, 2023, for the incision and drainage of his cyst. *Id.* at 19-22. Emge also received orthotics/special shoes and a knee brace. ECF 20-11, at 21-22.

Dr. Donald Alves, the current Medical Director at ECI, attests in a sworn affidavit that Emge's medical needs were not ignored and states that Emge has continued to received pain medication and regular chronic care visits. ECF 20-2, at 11 ¶ 23. Dr. Alves further states that medical providers try to see chronic care patients every three months, but three-month visits are

not medically necessary for all conditions. *Id.* Emge received his medications even when he was

not seen by a provider. *Id.* Dr. Alves also states that Emge's condition was never emergent. *Id.*

## III.    Standard of Review

Defendants' motion is construed as one seeking summary judgment.[2]  Summary judgment

is governed by Fed. R. Civ. P. 56(a) which provides "[t]he court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any

factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

---

[2] Defendants move for dismissal or for summary judgment. A motion styled in this manner
implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See
Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011),
*aff'd* 684 F.3d 462 (4th Cir. 2012).  Conversion of a motion to dismiss to one for summary
judgment under Rule 12(d) is permissible where a plaintiff has notice that the motion may be
disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149
F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the
alternative" as one for summary judgment and submits matters outside the pleadings for the
Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may
occur because the Court "does not have an obligation to notify parties of the obvious." *Laughlin*,
149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D.
Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before
a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civil No. DKC
10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012)). Emge has been on notice that Defendants
seek summary judgment since the filing of the motion on May 15, 2024, ECF 20, and after
receiving the Court's Rule 12/56 Notice, which was mailed on May 16, 2024, ECF 21. *See* Fed.
R. Civ. P. 12(d) (noting that if a court is going to treat a motion to dismiss as one for summary
judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is
pertinent to the motion"). As such, Defendants' dispositive submission will be treated as a motion
for summary judgment under Fed. R. Civ. P. 56 because materials outside the original pleadings
have been considered.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## IV.   Analysis

Emge raises an Eighth Amendment claim against Defendants for failure to treat his medical conditions which requires evidence of both a serious medical need and deliberate indifference to that need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v.*

8

*Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.  *See Farmer*, 511 U.S. at 839–40.  Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'"  *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be

9

considered merely *desirable.*" *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977)). "[A]n inadvertent failure to provide adequate medical care" does not amount to deliberate indifference." *Estelle*, 429 U.S. at 105–06; *accord Anderson*, 877 F.3d at 543 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference.").

Defendants assert that Emge did not have an objectively serious medical need and therefore his claim must fail. ECF 20-1 at 17. They further argue that even if he did present a serious medical condition, no YesCare custom or policy deprived Emge of his constitutional rights, nor is there supervisory liability for the ECI Medical Director. *Id.* at 18-20.

Defendants' main contention is that Emge's chronic nerve and joint pain is not objectively serious and therefore cannot support a § 1983 claim. They argue that Emge did not appear to be in pain, walked with a steady gait, and did not need to be placed on a special needs tier. ECF 20-1 at 17. While a lay person may not recognize that Emge was coping with chronic pain, it "has been diagnosed by a physician as mandating treatment." *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241). Despite Emge's appearance, medical providers have continued to monitor and prescribe medications to manage his nerve and joint pain. As such, the Court finds that Emge has presented an objectively serious medical need.

10

However, Emge has not demonstrated deliberate indifference by Defendants. First, as to YesCare, nothing indicates that any delays in medical care were caused by a custom or policy of the contracted medical provider. In the case of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that local governmental entities may be liable under § 1983 based on the unconstitutional actions of individual defendants where those defendants were executing an official policy or custom of the local government that violated the plaintiff's rights. *Id.* at 690–91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

Of import here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g., West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cnty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, those standards applicable to municipalities apply with full force to YesCare. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted).

A viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g., Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). The thrust of Emge's argument is that he was not seen by a chronic care provider as often as he thinks

11

he should have been to monitor his conditions. However, Emge fails to establish a dispute of material fact that this was a result of a custom or policy enforced by YesCare. Dr. Alves attests that while chronic care patients are generally seen every three months, it is not always medically necessary. Here, even when Emge was not seen by a provider, his medications were updated and refilled as needed. Summary judgment must be granted in YesCare's favor as there is no evidence of a custom or policy which led to deliberate indifference to Emge's chronic pain.

Finally, as to the ECI Medical Director, Emge's claim also fails. Dr. Alves, the current ECI Medical Director, attests that during the relevant time period Dr. Jason Clem and Dr. Mauro Sarmiento were the Medical Directors at ECI. ECF 20-2 at ¶ 2. Importantly, Emge's medical records do not show that either Dr. Clem or Dr. Sarmiento were ever Emge's provider. At most, the record reflects that Dr. Clem approved prescriptions written by other providers. *See* ECF 20-8 at 11, 25, 39; ECF 20-9 at 20. Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Having not participated in Emge's care, neither can be held liable under § 1983.

Moreover, even to the extent Emge sues the Medical Director in their supervisory capacity, his claim still fails. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that their

. 12

subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Emge has not identified any subordinates of the ECI Medical Director who he alleges violated his constitutional rights. Regardless, his records show that even though Emge was not seen as often as he desired he was seen in chronic care by various providers who made consistent efforts to manage his pain and other conditions. Outside of chronic care, Emge was also seen for his numerous sick calls. While he asserts in many of his sick call requests that his condition was grave or emergent, when evaluated by medical providers, he did not present with any life-threatening symptoms. The Court notes that despite a documented history of medication diversion and abuse, medical providers continued to monitor Emge's chronic pain and adjusted dosages when it was medically indicated. Any disagreement Emge may have with the providers' decisions regarding his pain management does not amount to a constitutional violation. Indeed, Emge's short response to the supported motion for summary judgment provides only the bare assertions that "YesMedical is still not in full compliance" and alleging that the "proper procedure needs to be followed." ECF 22, at 1.[3] Though Emge unquestionably continues to raise issue with his care,

---

[3] Emge attaches to his short response another ARP submitted on September 22, 2024 alleging that his last "chronic care date" was March 11, 2024, that his medications were renewed on July 8, 2024, and that his prescriptions "end" on November 4, 2024. ECF 22-1, at 1. The Warden responded on October 15, 2024 by affirming Emge's allegation as "[m]eritorious in [p]art" because Emge had been seen for chronic care on March 11, 2024 and again on July 11, 2024, thus "exceeding [ECI's] 90-day policy." *Id.*; *see also* ECF 20-2, at 11 ¶ 23 ("While we strive for patients in CCC to be seen every three months, three-month visits are not medically necessary for all

he fails to refute the proffered evidence that he was being seen by medical staff and receiving chronic care. Therefore, the record does not support a finding their either the ECI Medical Director or any other provider at ECI acted with deliberate indifference.

**V.      Conclusion**

For the reasons stated herein, Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment, construed as a motion for summary judgment, is granted.

A separate Order follows.

January 30, 2025                                         /s/
Date                                          Brendan A. Hurson
                                              United States District Judge

---

chronic conditions.")  Plaintiff's submission certainly bolsters his claim that he wasn't seen for chronic care as often as he would have liked, or perhaps even as often as ECI's policies and procedures called for.  However, the voluminous and uncontroverted record submitted in support of Defendants' motion also reflects that Plaintiff's medications were being filled and that Plaintiff was receiving non-chronic care sick call visits with regularity.  As such, Plaintiff's short response fails to generate a dispute of material fact as to whether subordinates of the ECI Medical Director were subjectively reckless in treating or failing to treat Plaintiff's serious medical condition in violation of the Eighth Amendment.

14